Daniel Blau (Cal. Bar No. 305008)
Email: blaud@sec.gov
Christopher A. Nowlin (Cal. Bar No. 268030)
Email: nowlinc@sec.gov

Attorneys for Plaintiff
Securities and Exchange Commission
Michele Wein Layne, Regional Director
Alka N. Patel, Associate Regional Director
Gary Y. Leung, Regional Trial Counsel
444 S. Flower Street, Suite 900
Los Angeles, California 90071
Telephone: (323) 965-3998
Facsimile: (213) 443-1904

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>    Plaintiff,<br><br>    vs.<br><br>JOHN MARK MARINO, JASON "JAI" JOHNSON, ABRAHAM BORENSTEIN, AND ANTHONY BROWN,<br><br>    Defendants. | Case No.   2:23-CV-00403<br><br>**COMPLAINT** |

Plaintiff Securities and Exchange Commission ("SEC") alleges:

## JURISDICTION AND VENUE

1.  The Court has jurisdiction over this action pursuant to Sections 20(b), 20(d)(1) and 22(a) of the Securities Act of 1933 ("Securities Act"), 15 U.S.C. §§ 77t(b), 77t(d)(1) & 77v(a), and Sections 21(d)(1), 21(d)(3)(A), 21(e) and 27(a) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. §§ 78u(d)(1),

78u(d)(3)(A), 78u(e) & 78aa(a).

2. Defendants have, directly or indirectly, made use of the means or instrumentalities of interstate commerce, of the mails, or of the facilities of a national securities exchange in connection with the transactions, acts, practices and courses of business alleged in this complaint.

3. Venue is proper in this district pursuant to Section 22(a) of the Securities Act, 15 U.S.C. § 77v(a), and Section 27(a) of the Exchange Act, 15 U.S.C. § 78aa(a). because certain of the transactions, acts, practices and courses of conduct constituting violations of the federal securities laws occurred within this district. In addition, venue is proper in this district because Defendants Jason "Jai" Johnson and Anthony Brown reside in this district.

## SUMMARY

4. This is a case about a fraud involving, among others, a disbarred attorney and a practicing attorney, who bilked an unsuspecting couple out of $150,000 with false promises of investment profits. Defendants John Mark Marino and Jason "Jai" Johnson perpetrated, and defendants Abraham Borenstein and Anthony Brown aided and abetted, a prime bank fraud. They convinced a senior citizen investor couple to invest $150,000 of their retirement funds with promises of exponential returns (profits of $1 million) within 30 days. Marino, a disbarred attorney, and Johnson told the investors that their money would be used to pay fees for the "monetization" of a €1.5 billion medium-term note ("MTN") issued by an international bank. They described the investment as the "opportunity of a lifetime" and a "slam dunk," and they guaranteed they would pay back the investors their $150,000, even if the underlying transaction did not occur. Marino and Johnson claimed to have made large profits off similar transactions in the past and that Johnson and Brown, also known as Tony Petrillo, would be investing in the current transaction alongside the investors. To deceive them into believing in the legitimacy of this MTN transaction, Marino provided the investors with Euroclear

COMPLAINT                                        2

documentation and bank statements regarding a €1.5 billion MTN. The victims were further comforted by being told by Marino to wire their investment to the attorney trust account of Borenstein, who would disburse funds to complete the MTN transaction.

5. None of this was true. In reality, Marino did not own or control any MTN that he could monetize to generate the high returns that he promised, and he and Johnson had not made money off similar transactions in the past. The documentation and bank statements that Marino provided to the investors were forgeries. Marino misappropriated the investors' funds and used them for a variety of things unrelated to any MTN transaction, including to pay his personal living expenses and to make transfers to Johnson and Brown. For a $15,000 fee, attorney Borenstein facilitated this fraud by serving as what he called a "paymaster" and allowing the investor money to flow through his attorney trust account and dissipating it at Marino's direction, despite receiving an email that put him on notice that it was money destined for a supposed MTN transaction. Brown assisted Marino by connecting Marino with Johnson and the investors in return for a share of the misappropriated proceeds. After misappropriating their money, Marino lulled the investors by telling them that the COVID-19 pandemic had caused the unanticipated failure of the investment, claiming he had received no money from their funds, and repeatedly assuring them that he would soon repay them, which he has not.

## THE DEFENDANTS

6. John Mark Marino, age 83, is a resident of Delray Beach, Florida. Marino was previously a licensed attorney in Pennsylvania, but he was disbarred in 1984 in connection with a criminal conviction for mail fraud. Marino, who has changed his name at least twice in the past, has a lengthy criminal record that includes convictions and prison time related to securities fraud.

7. Jason "Jai" Johnson, age 58, is a resident of Perris, California.

8. Abraham Borenstein, age 73, is a resident of Springfield, New Jersey.

Borenstein is a licensed attorney in both New York and New Jersey, and he is a partner in Borenstein, McConnell & Calpin, P.C., a New Jersey-based law firm.

9. Anthony Brown (aka "Tony Petrillo"), age 56, is a resident of Glendale, California.

## THE ALLEGATIONS

**A.  The Investment Pitch**

10. Victims 1 and 2 are husband and wife. During the relevant period, they resided in Torrance, California.

11. Victims 1 and 2 are senior citizens.

12. As of early 2020, Victims 1 and 2 did not satisfy the net worth or annual income standards to qualify as accredited investors under the federal securities laws.

13. In or around February 2020, Johnson began pitching an investment opportunity to Victim 1 that Johnson claimed would give Victims 1 and 2 guaranteed substantial returns within 30 days.

14. Johnson had befriended Victim 1 and Victim 2 and presented himself as a successful investment adviser. Johnson described the investment at issue as involving the monetization of an MTN issued by an international bank, explaining that it would be coordinated by Marino.

15. In touting the opportunity to Victim 1, Johnson represented that he and Brown had recently invested in a similar MTN investment with Marino in which each invested $250,000 and received $2.5 million within 30 days.

16. Johnson also represented that he and Brown would be investing their own money alongside Victims 1 and 2.

17. Johnson told Victim 1 that within 30 to 45 days their returns would be many multiples of what they invested, and he described the investment as risk-free and a "sure thing."

18. Johnson also guaranteed that he personally would pay back Victims 1 and 2's principal if the underlying MTN transaction did not take place.

19. Johnson introduced Victim 1 to Marino, who further described the investment to Victim 1.

20. At the time, Johnson had only recently met Marino through Brown.

21. Unbeknownst to Victims 1 and 2, Marino had reached out to Brown for help finding an investor, and Marino offered both Brown and Johnson a commission if they could find him one.

22. Marino, a disbarred attorney with a long criminal record, passed himself off to Victim 1 as a successful practicing attorney who was experienced in similar transactions.

23. In calls with Victim 1 in February and March 2020, in which both Johnson and Brown also participated, Marino told Victim 1 his money would be used to pay administrative fees in connection with an effort to "monetize" a supposed €1.5 billion MTN issued by a well-known international bank.

24. On these calls, Marino touted the investment's guaranteed exponential returns of roughly $1 million, telling Victim 1 the investment was low risk and a "slam dunk," and that Victims 1 and 2 would be rich after receiving huge returns within 30 days.

25. On these calls, Marino and Johnson stated that they and Brown had done similar MTN transactions in the recent past and made large profits. Brown, who was on these calls, stayed silent while Marino and Johnson made representations about his purported success with similar MTN transactions.

26. Before investing, Victims 1 and 2 told Marino and Johnson that they were taking the money from their retirement account and could face a significant monetary penalty if they did not return the funds within a set period.

27. To resolve their concerns, Marino guaranteed that the MTN monetization transaction would be complete, and Victims 1 and 2 would have their profits, within 30 days.

28. Marino also stated that if for any reason the monetization transaction did

not happen within 30 to 45 days, he would personally pay back Victims 1 and 2's $150,000 principal.

29. Marino sent Victim 1 an investment agreement attached to an email dated February 24, 2020. In that investment agreement, Marino again stated that the funds would be used for an MTN transaction and guaranteed repayment of principal if the MTN transaction did not occur within 30 days, extendable upon consent of both parties to 45 days. Marino also stated that Victim 1 would be entitled to up to $5 million in profits from the transaction. Marino copied Brown on that email.

30. In that February 24, 2020 email, Marino also attached various documents purportedly related to the MTN transaction, including Euroclear and bank statement documentation indicating that an entity named CV International Investments Ltd. owned a €1.5 billion MTN issued by a well-known international bank. Marino provided Victim 1 with wiring instructions for an attorney trust account for the Borenstein McConnell law firm.

31. On March 7, 2020, Marino sent Brown an email attaching a substantially identical investment agreement which Marino had drafted. Brown forwarded the email and attachment to Johnson, who forwarded it to Victim 1. In that investment agreement, Marino reiterated his statements regarding use of funds for an MTN transaction, astronomical returns (up to $1 million), short 30-day duration, and guaranteed repayment of principal.

32. Marino signed the investment agreement purportedly as an "Attorney" on behalf of the New Jersey-based Borenstein McConnell law firm, which was the nominal counterparty on the face of the agreement.

33. Marino and Johnson's statements about the use of funds were material to Victims 1 and 2's decision to invest. Victims 1 and 2 considered it important that their money be used on a transaction like that described to them so that they could achieve the high returns.

34. Marino and Johnson's statements about the short duration of the

transaction and guaranteed repayment of their investment were material to Victims 1 and 2's decision to invest. It was important to them that they get their money back within 30 days because of the potential retirement account penalty.

35. Marino and Johnson's statements about their and Brown's prior success with similar transactions were material to Victims 1 and 2's decision to invest. It was important to them that Marino had purportedly generated high investment returns through past MTN transactions.

36. Johnson's statements about his and Brown's intent to invest their own funds into the instant deal were material to Victims 1 and 2's decision to invest. It was important to them that Johnson, who was touting the investment to them, had claimed that he was personally invested in the same MTN transaction.

37. Marino's statements regarding his association with a law firm and the use of an attorney trust account to facilitate the investment were material to Victims 1 and 2's decision to invest. The involvement of the Borenstein McConnell law firm gave Victims 1 and 2 comfort that the investment was legitimate.

38. As instructed by Marino, Victims 1 and 2 wired their $150,000 to the attorney trust account for the Borenstein McConnell law firm in March 2020.

**B. Marino and Johnson's False Statements and Misappropriation of Investor Funds**

39. Almost everything that Marino and Johnson told Victims 1 and 2 about the supposed investment opportunity was false or misleading.

**1. Marino and Johnson's Misstatements Regarding MTN Transactions and their Professional Background**

40. The MTN-related documentation that Marino sent Victims 1 and 2 was an elaborate forgery that falsely indicated that the entity CV International owned a €1.5 billion MTN issued by a well-known international bank. In reality, CV International never owned any such MTN.

41. Marino always knew there was no such MTN owned by CV

COMPLAINT 7

International.

42. Marino did not in fact own or have control over any MTN, let alone one valued at over €1.5 billion, that he could monetize to achieve the substantial returns that he promised.

43. Marino and Johnson also falsely represented their backgrounds and experiences with similar transactions.

44. Neither Johnson nor Brown had ever actually made any similar MTN investments, let alone realized the massive profits that Johnson had touted to Victims 1 and 2.

45. Moreover, neither Johnson nor Brown had ever invested their own money into this kind of investment.

46. Further, Johnson was not a successful investment adviser and had only "managed" a few thousand dollars for himself and his girlfriend.

47. Marino likewise had never personally been involved in making money in a similar MTN transaction despite his claims to the contrary.

48. Further, Marino had been disbarred in Pennsylvania in 1984 because of a criminal conviction and had not been licensed to practice law since then. He had also served time in prison for various criminal offenses. Marino never told Victims 1 and 2 any of this, and they never would have invested had they known.

49. Marino was not an attorney with or employee of the Borenstein McConnell law firm and had no authority to enter into the investment agreement on the firm's behalf.

### 2. The Misappropriation of Victims 1 and 2's Funds, and Borenstein's Role

50. Moreover, Marino did not use Victims 1 and 2's funds as he and Johnson had represented he would. Instead, immediately after Victims 1 and 2 wired their funds, Marino directed Borenstein, the Borenstein McConnell law firm principal and supposed transaction "paymaster," to disburse the investor funds from the firm's

attorney trust account for purposes unrelated to an MTN monetization.

51. Borenstein was a long-time Marino associate who had served as "paymaster" for other transactions involving Marino.

52. Borenstein knew that Marino had been disbarred and served time in prison, and Borenstein had in the past been named as a co-defendant with Marino in a private civil suit alleging investment fraud.

53. Borenstein knew that he was disbursing funds which were supposedly for an MTN transaction.

54. Marino had sent Borenstein an email on March 13, 2020, hours before Victims 1 and 2 wired their funds to Borenstein's attorney trust account, telling Borenstein that the incoming $150,000 was for fees for a supposed MTN transaction, and Marino attached the forged MTN documentation to that email.

55. The next business day, on March 16, 2020, Borenstein disbursed the money per Marino's instructions, without doing any diligence of the senders of the money, why they had sent the funds, or whether Marino's disbursement directions were consistent with what Marino had told them.

56. Although Marino's email to Borenstein represented that the incoming funds were for a purported MTN transaction, Marino instructed Borenstein to disburse the funds in a manner that had no apparent connection to any purported MTN transaction, and Borenstein disbursed the funds per those instructions.

57. At Marino's direction, Borenstein disbursed $65,700 to a personal account controlled by Marino and his wife. Marino then spent that money on his personal living expenses and not on any MTN transaction.

58. At Marino's direction, Borenstein disbursed over $56,430 to a bank account of an entity controlled by Brown. Brown had been involved in Marino's discussions and emails with Victim 1, and he had sent Marino an email regarding the expected receipt of investor funds, as well as wiring instructions for his own bank account, in the days immediately before he received $56,430 of investor money.

1. Brown then used the money to pay personal living expenses, and Marino knew Brown would spend the money that way when he directed that the funds be disbursed to Brown.

59. At Marino's direction, Borenstein disbursed $5,840 to Johnson as a supposed commission.

60. Finally, as authorized by Marino, Borenstein kept $15,000 of the funds received from Victims 1 and 2 as a paymaster fee.

61. No part of Victims 1 and 2's $150,000 was used for the transaction that Marino and Johnson had described to them.

## C. Lulling Activity

62. Marino and Johnson have not repaid any of the investors' principal nor any of the promised returns.

63. Marino repeatedly told Victims 1 and 2 that the COVID-19 pandemic shut down international travel and banking and prevented him from completing the MTN transaction.

64. At various times following the investment, each of Marino, Johnson, and Brown falsely told Victims 1 and/or 2 that he had not personally received or profited from any of the money Victims 1 and 2 invested.

65. In multiple post-investment oral conversations, and in various written communications, including emails dated April 6, 2020, April 28-29, 2020, May 8, 2020, August 19, 2020, September 2, 2020, December 7, 2020, and January 19, 2021, Marino told Victims 1 and 2 that he would soon close the MTN transaction, or that he would repay them with proceeds from another deal, representing in a few instances that he was about to receive millions of dollars and would use that money to repay them.

66. In multiple post-investment oral conversations, and in text messages dated October 7, 2020, October 13, 2020, October 21, 2020, and October 29, 2020, Johnson likewise told Victims 1 and 2 that they would soon be repaid.

67. On December 7, 2020, Brown falsely told Victim 1 that he personally had not received any of Victim 1's invested funds and further stated that Marino had told him Victim 1 would be compensated soon.

68. Borenstein participated in lulling Victim 1 in an email exchange dated May 14-15, 2020, by telling him that he was personally working with a large well-known bank to process into his attorney trust account a supposed $20 million incoming international wire from which Victim 1 would be repaid, representing that the wire was "in compliance" and "in the queue" at the bank, when in reality Borenstein later admitted that no such wire ever even existed.

69. As Victims 1 and 2 continued to press for repayment, Marino and Johnson made oblique threats to their physical safety, citing Marino's supposed ties to organized crime and Johnson's claimed connections to a Los Angeles-area gang.

**D.     Marino and Johnson's Scienter and Unreasonable Conduct**

70. Marino acted with scienter.

71. Johnson acted with scienter

72. Marino knew CV International did not actually own any MTNs and that he did not have control over any such instruments that he could monetize.

73. Marino also personally directed the dissipation of the investor money immediately after receiving it, clearly aware that directing it as he did was inconsistent with how he had described the investment to the investors.

74. Marino likewise knew that he had not in the past been involved with other profitable MTN transactions and that he was not a practicing attorney authorized to enter into the investment agreement on behalf of the Borenstein McConnell law firm.

75. Marino further acted negligently because his conduct when defrauding Victims 1 and 2 of their $150,000 in retirement savings was unreasonable.

76. Johnson knew that he had not made money from investing in similar previous deals, and that he was not going to invest in the instant transaction.

77. Johnson also knew, or was reckless in not knowing, that his statements about guaranteed high returns within a month, and his assurance that he would pay the investors back, were false or misleading.

78. Johnson further acted negligently because his conduct when defrauding Victims 1 and 2 of their $150,000 in retirement savings was unreasonable.

**E.   The $150,000 Investment is a Security**

79. The $150,000 MTN investment constituted a security.

80. Victims 1 and 2 invested money and expected to receive returns from a successful monetization of an MTN, the managerial efforts for which were to be led entirely by Marino and his associates.

81. Victims 1 and 2's role was to be entirely passive, and they were relying fully on the efforts of Marino and Johnson to generate their promised returns.

82. Victims 1 and 2 understood their funds would be pooled together with those of other investors, including Johnson and Brown, to effectuate the underlying transaction.

83. Victims 1 and 2 understood the fortunes of the investors and the promoters were linked because both were purportedly to achieve returns from the MTN monetization effort.

**FIRST CLAIM FOR RELIEF**

**Fraud in the Connection with the Purchase and Sale of Securities**

**Violations of Section 10(b) of the Exchange Act and Rule 10b-5**

**(against Defendants Marino and Johnson)**

84. The SEC realleges and incorporates by reference paragraphs 1 through 83 above.

85. Marino made false and misleading statements to investors. Marino falsely claimed that he was soliciting funds for use in an MTN transaction, presented forged documents which purported to show the existence of the MTN, falsely claimed that the investment profits would be provided to investors within thirty days,

falsely claimed to have undertaken previous successful MTN transactions, and falsely claimed to guarantee investors' principal if the MTN transaction failed. Marino's misstatements were made with scienter.

86. Johnson made false and misleading statements to investors. Johnson falsely claimed that (1) investors were guaranteed substantial returns in a short period of time, (2) he would personally guarantee repayment of the $150,000 principal, (3) he was a successful investment adviser, (4) he personally invested in an MTN transaction with Marino in the recent past, and (5) he made substantial profits from that transaction. Johnson also falsely told the investors he would personally be investing in the instant MTN transaction, and disseminated the written investment contract and other information from Marino that contained false and misleading statements. Johnson's misstatements were made with scienter.

87. By engaging in the conduct described above, Defendants Marino and Johnson, directly or indirectly, in connection with the purchase or sale of a security, by the use of means or instrumentalities of interstate commerce, of the mails, or of the facilities of a national securities exchange: (a) employed devices, schemes, or artifices to defraud; (b) made untrue statements of a material fact or omitted to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; and (c) engaged in acts, practices, or courses of business which operated or would operate as a fraud or deceit upon other persons.

88. By engaging in the conduct described above, Defendants Marino and Johnson violated, and unless restrained and enjoined will continue to violate, Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rules 10b-5(a), 10b-5(b), and 10b-5(c) thereunder, 17 C.F.R. §§ 240.10b-5(a), 240.10b-5(b) & 240.10b-5(c).

# SECOND CLAIM FOR RELIEF

## Fraud in the Offer or Sale of Securities

## Violations of Section 17(a) of the Securities Act

### (against Defendants Marino and Johnson)

89. The SEC realleges and incorporates by reference paragraphs 1 through 83 above.

90. Marino made false and misleading statements to investors. Marino falsely claimed that he was soliciting funds for use in an MTN transaction, presented forged documents which purported to show the existence of the MTN, falsely claimed that the investment profits would be provided to investors within thirty days, falsely claimed to have undertaken previous successful MTN transactions, and falsely claimed to guarantee investors' principal if the MTN transaction failed. Marino's misstatements were made with scienter.

91. Johnson made false and misleading statements to investors. Johnson falsely claimed that (1) investors were guaranteed substantial returns in a short period of time, (2) he would personally guarantee repayment of the $150,000 principal, (3) he was a successful investment adviser, (4) he personally invested in an MTN transaction with Marino in the recent past, and (5) he made substantial profits from that transaction. Johnson also falsely told the investors he would personally be investing in the instant MTN transaction, and disseminated the written investment contract and other information from Marino that contained false and misleading statements. Johnson's misstatements were made with scienter.

92. By engaging in the conduct described above, Defendants Marino and Johnson, and each of them, directly or indirectly, in the offer or sale of securities, and by the use of means or instruments of transportation or communication in interstate commerce or by use of the mails directly or indirectly: (a) employed devices, schemes, or artifices to defraud; (b) obtained money or property by means of untrue statements of a material fact or by omitting to state a material fact necessary in order

to make the statements made, in light of the circumstances under which they were made, not misleading; and (c) engaged in transactions, practices, or courses of business which operated or would operate as a fraud or deceit upon the purchaser.

93. By engaging in the conduct described above, Defendants Marino and Johnson violated, and unless restrained and enjoined will continue to violate, Sections 17(a)(1), 17(a)(2), and 17(a)(3) of the Securities Act, 15 U.S.C. §§ 77q(a)(1), 77q(a)(2), & 77q(a)(3).

## THIRD CLAIM FOR RELIEF

### Aiding and Abetting Violations of
### Sections 17(a) of the Securities Act and
### Section 10(b) of the Exchange Act, and Rule 10b-5
### (against Defendants Borenstein, Brown, and, in the alternative, Johnson)

94. The SEC realleges and incorporates by reference paragraphs 1 through 83 above.

95. Borenstein knowingly and/or recklessly provided substantial assistance to Marino's fraudulent conduct. He substantially assisted Marino's investment fraud by allowing the investor money to flow through his law firm's attorney trust account and then immediately disbursing the money at Marino's direction. Though purportedly serving as "paymaster" for this transaction and thereby lending his law firm's imprimatur to it, Borenstein took no steps to verify who had sent the money, why they had sent it, or whether Marino's disbursement directions were consistent with what Marino had told them. Borenstein knowingly distributed the money for Marino's personal benefit despite having received an email from Marino indicating that the money was sent to pay fees for a transaction involving a €1.5 billion MTN, an email that on its face was highly suspect and should have raised red flags for Borenstein. Borenstein's receipt of $15,000, or 10% of the $150,000 invested, should have further raised red flags for him that he was not serving as a simple pass-through for an innocent transaction. Borenstein further lulled Victim 1 where he represented

to Victim 1 that a $20 million incoming wire to his attorney trust account, from which Victim 1 would supposedly be repaid, was "in compliance" and "in the queue" at the bank, when in fact Borenstein acknowledged that no such wire ever existed.

96. Brown knowingly and/or recklessly aided and abetted Marino's fraud. Brown, who had a monetary stake in locating an investor for Marino, connected Marino to Johnson, who in turn connected Marino to the investors. Brown was also present on multiple calls where Marino and Johnson described the details of the investment to Victim 1. On these calls, Marino and Johnson stated that Johnson and Brown had previously invested in similar deals with Marino that had been wildly profitable, which was a total fabrication. Marino also copied Brown on his emails to Victim 1 that described the investment in detail, with Brown at one point forwarding on the investment contract from Marino to Johnson, which Johnson then provided to Victim 1. Brown was aware of exactly how Marino and Johnson had pitched the investment, including how they said they would use the investors' funds. At Marino's direction, Brown received approximately $56,400 of the investors' funds, which he used entirely on his personal living expenses. Brown knew that the money he received came from investor funds. Moreover, post-investment, Brown misrepresented to the investors that he never received any of their funds.

97. In the alternative, Johnson knowingly and/or recklessly provided substantial assistance to Marino's fraudulent conduct. He substantially assisted the investment fraud by locating the investor couple for Marino, keeping them connected to Marino by facilitating and participating in phone calls between the couple and Marino where Marino touted the investment, and aggressively pitching the investors on the investment opportunity himself. Johnson knew or was reckless in not knowing that the investment was fraudulent. Johnson made multiple false statements to the investors so as to induce them to invest, including statements that he made exponential returns on similar deals in the past and intended to invest alongside them in the instant deal, with him going so far as to personally guarantee repayment of

principal. He also participated in calls where Marino parroted this same false narrative that Johnson had been wildly successful on similar deals. To the extent he relied on Marino's representations, Johnson was reckless in aggressively vouching for and passing off as fact spurious information received from someone he had just met, and then supplementing those statements with his own lies. Further, in the months after the investment, Johnson continued to lull the investors by telling them they would soon be repaid and that he had never received any portion of their funds, though he knew that the over $5,800 he received came from their funds.

98. By reason of the conduct described above, and in violation of Section 15(b) of the Securities Act, 15 U.S.C. § 77o(b), and Section 20(e) of the Exchange Act, 15 U.S.C. § 78t(e), Defendants Borenstein, Brown, and Johnson knowingly and recklessly provided substantial assistance to, and thereby aided and abetted their co-schemers in their violations of Section 17(a) of the Securities Act, 15 U.S.C. § 77q(a), and Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 thereunder, 17 C.F.R. § 240.10b-5.

## **PRAYER FOR RELIEF**

WHEREFORE, the SEC respectfully requests that the Court:

### I.

Issue findings of fact and conclusions of law that Defendants committed the alleged violations.

### II.

Issue judgments, in forms consistent with Rule 65(d) of the Federal Rules of Civil Procedure, permanently enjoining Defendants Marino, Johnson, Brown, and Borenstein, and their officers, agents, servants, employees and attorneys, and those persons in active concert or participation with any of them, who receive actual notice of the judgment by personal service or otherwise, and each of them, from violating Section 17(a) of the Securities Act [15 U.S.C. §77q(a)], and Section 10(b) of the Exchange Act [15 U.S.C. §§ 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-

5].

### III.

Issue judgments, in forms consistent with Rule 65(d) of the Federal Rules of Civil Procedure, permanently enjoining Defendants Marino, Johnson, and Brown, and their officers, agents, servants, employees and attorneys, and those persons in active concert or participation with any of them, who receive actual notice of the judgment by personal service or otherwise, and each of them, from, directly or indirectly, including but not limited to, through any entity owned or controlled by him, participating in the issuance, purchase, offer, or sale of any security in an unregistered offering, provided, however, that such injunction shall not prevent him from purchasing or selling securities for his own personal account.

### IV.

Issue judgments, in forms consistent with Rule 65(d) of the Federal Rules of Civil Procedure, permanently enjoining defendant Borenstein, and his officers, agents, servants, employees and attorneys, and those persons in active concert or participation with any of them, who receive actual notice of the judgment by personal service or otherwise, and each of them, from, directly or indirectly, including but not limited to, through any entity owned or controlled by him, participating in, including acting as a paymaster in connection with, the issuance, purchase, offer, or sale of any security in an unregistered offering, provided, however, that such injunction shall not prevent him from purchasing or selling securities for his own personal account. As used here, the term "paymaster" refers to someone who serves as an intermediary who receives funds from an investor and disburses them pursuant to instructions.

### V.

Order Defendants to disgorge all funds received from their illegal conduct, together with prejudgment interest thereon, pursuant to Sections 21(d)(5) and 21(d)(7) of the Exchange Act [15 U.S.C. § 78u(d)(5) & 78u(d)(7)].

## VI.

Order Defendants to pay civil penalties under Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)] and Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)].

## VII.

Order Defendant Marino to be barred from serving as an officer or director pursuant to Section 20(e) of the Securities Act and Section 21(d)(2) of the Exchange Act.

## VIII.

Retain jurisdiction of this action in accordance with the principles of equity and the Federal Rules of Civil Procedure in order to implement and carry out the terms of all orders and decrees that may be entered, or to entertain any suitable application or motion for additional relief within the jurisdiction of this Court.

## IX.

Grant such other and further relief as this Court may determine to be just and necessary.

Dated:  January 19, 2023

/s/ Daniel Blau
Daniel Blau
Christopher A. Nowlin
Attorney for Plaintiff
Securities and Exchange Commission