1  DANIEL BLAU (Cal. Bar No. 305008)
   Email: blaud@sec.gov
2  CHRISTOPHER A. NOWLIN (Cal. Bar No. 268030)
   Email: nowlinc@sec.gov
3
4  Attorneys for Plaintiff
   Securities and Exchange Commission
   Gary Y. Leung, Associate Director
5  Brent W. Wilner, Associate Director
   Douglas M. Miller, Supervisory Trial Counsel
6  444 S. Flower Street, Suite 900
   Los Angeles, California 90071
7  Telephone: (323) 965-3998
   Facsimile: (213) 443-1904
8

9                    **UNITED STATES DISTRICT COURT**

10                  **CENTRAL DISTRICT OF CALIFORNIA**

11                          **Western Division**

12
   SECURITIES AND EXCHANGE            Case No.  2:23-cv-00403 CAS(AFMx)
13 COMMISSION,
                                      **PLAINTIFF SECURITIES AND**
14            Plaintiff,              **EXCHANGE COMMISSION'S**
                                      **APPLICATION FOR DEFAULT**
15    vs.                            **JUDGMENT AGAINST DEFENDANT**
                                      **JASON "JAI" JOHNSON**
16 JOHN MARK MARINO, JASON
   "JAI" JOHNSON, ABRAHAM             **Date:** August 25, 2025
17 BORENSTEIN, AND ANTHONY            **Time:** 10:00 a.m.
   BROWN,                             Judge: Hon. Christina A. Snyder
18
             Defendants.
19

20

21

22

23

24

25

26

27

28

# **TABLE OF CONTENTS**

I.     INTRODUCTION ................................................................................1

II.    PROCEDURAL HISTORY ...............................................................1

III.   FACTS ...............................................................................................2

       A.    Facts Alleged in the Complaint ...............................................2

             1.    Johnson Background ......................................................2

             2.    The Investment Pitch .....................................................2

             3.    Johnson False Statements and Misappropriation of Investor Funds ..............................................................................4

             4.    Johnson's Lulling Activity.............................................4

             5.    Johnson's Scienter.........................................................5

             6.    The $150,000 Investment is a Security......................5

       B.    Defendant's Ill-Gotten Gains ................................................5

IV.    ARGUMENT......................................................................................6

       A.    Legal Standard.........................................................................6

       B.    The SEC has Complied with Rule 55 and Local Rules 55-1 and 55-27

       C.    The *Eitel* Factors Favor Entry of Default Judgment ............7

             1.    Possibility of Prejudice to the SEC..............................7

             2.    Substantive Merits and Sufficiency of the Complaint.............8

             3.    Amount at Stake...........................................................11

             4.    Possibility of Disputed Facts ......................................11

             5.    Possibility of Excusable Neglect ................................12

             6.    Policy for Deciding on the Merits...............................12

       D.    The SEC Is Entitled to the Relief It Seeks ..........................12

             1.    The Court Should Permanently Enjoin Johnson.........13

             2.    The Court Should Issue a Conduct-Based Injunction Against Johnson......................................................................16

             3.    The Court Should Order Disgorgement with Prejudgment Interest........................................................................16

i

4.    Johnson Should Pay a Substantial Civil Penalty .....................18

V.    CONCLUSION...............................................................................19

ii

1

## **TABLE OF AUTHORITIES**

2

**Cases**

3

*Aaron v. SEC,*
    446 U.S. 680 (1980)................................................................10

4

*Aldabe v. Aldabe,*
    616 F.2d 1089 (9th Cir. 1980) …......……………………..………… 6

5

6

*Benny v. Pipes,*
    799 F.2d 489 (9th Cir. 1986) ..………………………....……... 6, 7, 8, 13

7

8

*CFTC v. Fin. Tree,*
    No. 2:20-CV-01184-TLN-AC, 2020 WL 3893390
    (E.D. Cal. July 2, 2020)……………………………………………11

9

10

*Eitel v. McCool,*
    782 F.2d 1470, 1471-72 (9th Cir. 1986) …………………………6, 7, 8, 11, 12

11

*Ernst & Ernst v. Hochfelder,*
    425 U.S. 185 (1976)................................................................10

12

13

*Geddes v. United Financial Group,*
    559 F.2d 557 (9th Cir.1977) ....................................................14

14

15

*Heat & Frost Insulators of N. California Loc. Union No. 16 Health & Welfare*
    *Tr. Fund v. Rhodium Integrated Servs.,*
    No. 21-CV-04084-RS, 2022 WL 228304 (N.D. Cal. Jan. 26, 2022)…………14

16

*Herman & MacLean v. Huddleston,*
    459 U.S. 375 (1983)................................................................10

17

18

*Janus Capital Group, Inc. v. First Derivative Traders,*
    564 U.S. 135 (2011)..................................................................9

19

*Landstar Ranger, Inc. v. Parth Enterprises, Inc.,*
    725 F. Supp. 2d 916 (C.D. Cal. 2010)........................................7

20

21

*Liu v. SEC,*
    591 U.S. 71 (2020).................................................11, 16, 17

22

*Lorenzo v. SEC,*
    139 S. Ct. 1094 (2019)............................................................8

23

24

*Mullane v. Central Hanover Trust Co.,*
    339 U.S. 306 (1950)..............................................................12

25

26

*PepsiCo, Inc. v. Cal. Sec. Cans,*
    238 F. Supp. 2d 1172 (C.D. Cal. 2002)…..……………..……....…7, 8, 11, 12

27

28

*PepsiCo, Inc. v. Triunfo-Mex. Inc.,*
    189 F.R.D. 431 (C.D. Cal. 1999) …………………………………………..6

*SEC v. Abacus Int'l Holding Corp.*,
2001 U.S. Dist. LEXIS 12635 (N.D. Cal. Aug. 16, 2001) .............................18

*SEC v. Ahmed*,
72 F.4th 379 (2d Cir. 2023) ..............................................................................15

*SEC v. Baccam*,
No. ED CV 17-0172 SJO (SPx), 2017 WL 5952168
(C.D. Cal. June 14, 2017)……………………………………………..12, 15

*SEC v. Benger*,
931 F. Supp. 2d 904 (N.D. Ill. 2013) .................................................................9

*SEC v. Burns*,
816 F.2d 471 (9th Cir. 1987) ...........................................................................10

*SEC v. Carter*,
No. 8:16-cv-02070-JVS(DFMx), 2023 WL 9197565 (C.D. Cal. July 14,
2023). ...............................................................................................................15

*SEC v. Chappell*,
107 F.4th 114 (3d Cir. 2024) .............................................................13, 14, 16

*SEC v. Cross Fin. Services, Inc.*,
908 F. Supp. 718 (C.D. Cal. 1995) ...................................................................17

*SEC v. Dain Rauscher*,
254 F.3d 852, 856 (9th Cir. 2001)……………………………………….10

*SEC v. Fehn*,
97 F.3d 1276 (9th Cir. 1996) ...........................................................................14

*SEC v. First City Financial Corp.*, Ltd.,
890 F.2d 1215 (D.C. Cir. 1989) ................................................................16, 17

*SEC v. First Jersey Sec., Inc.*,
101 F.3d 1450 (2d Cir. 1996) ...........................................................................17

*SEC v. First Pac. Bancorp*,
142 F.3d 1186 (9th Cir. 1998) ....................................................................16, 17

*SEC v. Gentile*,
939 F.3d 549 (3d Cir. 2019) ............................................................................14

*SEC v. Giguiere*,
No. 18-cv-1530-WQH-JLB, 2024 WL 3550395 (S.D.Cal. Jun. 1, 2024).........17

*SEC v. Hughes Capital Corp.*,
124 F.3d 449, 453-54 (3d Cir.1997)……...…………………………… 10

*SEC v. Manor Nursing Centers, Inc.*,
458 F.2d 1082 (2d Cir. 1972) ....................................................................15, 17

*SEC v. Moleski*,
No. 2:21-cv-01605-SVW-E, 2021 WL 6752254 (C.D. Cal. Oct 21, 2021)......16

*SEC v. Murphy,*
    626 F.2d 633 (9th Cir. 1980) ........................................................14, 15, 16, 18

*SEC v. Neman,*
    CV 12-03142-BRO (PLAx),
    2016 U.S. Dist. LEXIS 193639 (C.D. Cal. July 15, 2016) ................................8

*SEC v. Olins,*
    762 F. Supp. 2d 1193 (N.D. Cal. 2011), as amended (Feb. 25, 2011) .............17

*SEC v. Pedras,*
    No. CV 13–7932 GAF (MRWx),
    2014 WL 12597332 (C.D. Cal. Apr. 16, 2014)....................................................8

*SEC v. Platforms Wireless Int'l Corp.,*
    617 F.3d 1072 (9th Cir. 2010) ........................................................9, 10, 16, 17, 18

*SEC v. Premier Holdings,*
    No. 21-55249 2022 WL 541194 (9th Cir. 2022)..................................................17

*SEC v. Rind,*
    991 F.2d 1486 (9th Cir. 1993) ................................................................................11

*SEC v. Rubera,*
    350 F.3d 1094 (9th Cir. 2001) ................................................................................10

*SEC v. Yang,*
    824 Fed. Appx. 445 (9th Cir. 2020) ...…………………………………17

*Starbucks v. McKinney,*
    144 S. Ct. 1570 (2024)................................................................................................13

*TeleVideo Sys., Inc. v. Heidenthal,*
    826 F.2d 915 (9th Cir.1987)…………..…………………..……7, 11, 13, 14

*TSC Indus., Inc. v. Northway, Inc.,*
    426 U.S. 43 (1976)........................................................................................................9

*Winter v. Nat. Res. Def. Council, Inc.,*
    555 U.S. 7 (2008)................................................................................13, 15, 16

**Federal Statutes**

26 U.S.C. § 6621(a)(2).............................................................................................18

**Securities Act of 1933**

Section 17(a)
    [15 U.S.C. § 77q(a)] ........................................................................................12

Section 17(a)(1)
    [15 U.S.C. § 77q(a)(1)]..................................................................................8, 10

Section 17(a)(2)
    [15 U.S.C. § 77q(a)(2)]..................................................................................9, 10

Section 17(a)(3)
    [15 U.S.C. § 77q(a)(3)]...................................................................8, 9, 10

Section 20(d)
    [15 U.S.C. § 77t(d)]...........................................................................18

Section 20(d)(1)
    [15 U.S.C. § 77t(d)(1)].................................................................11, 18

Section 20(d)(2)
    [15 U.S.C. § 77t(d)(2)]......................................................................18

Section 20(d)(2)(A)
    [15 U.S.C. § 77t(d)(2)(A)].................................................................18

Section 20(d)(2)(C)
    [15 U.S.C. § 77t(d)(2)(C)].................................................................18

**Securities Exchange Act of 1934**

Section 10(b)
    [15 U.S.C. § 78j(b)]………………………….......……….8, 9, 10, 12

Section 20(b)
    [15 U.S.C. § 77t(b)] …...…………………………………………13

Section 21(d)(1)
    [15 U.S.C. § 78u(d)(1)] ......................................................................13

Section 21(d)(3)
    [15 U.S.C. § 78u(d)(3)] ......................................................................18

Section 21(d)(3)(A)
    [15 U.S.C. § 78u(d)(3)(A)]............................................................11, 18

Section 21(d)(3)(B)
    [15 U.S.C. § 78u(d)(3)(B)] .................................................................18

Section 21(d)(3)(B)(iii
    [15 U.S.C. § 78u(d)(3)(B)(iii)] ...........................................................18

Section 21(d)(5)
    [15 U.S.C. § 78u(d)(5)]...………………………………….......…16

**Federal Regulations**

Rule 10b-5
    [17 C.F.R. § 240.10b-5]................................................................10, 12

Rule 10b-5(a)
    [17 C.F.R. § 240.10b-5(a)] ...................................................................8

Rule 10b-5(b)
    [17 C.F.R. § 240.10b-5(b)] ...................................................................9

Rule 10b-5(c)
    [17 C.F.R. § 240.10b-5(c)] .................................................................9

**Federal Rules of Civil Procedure**

Fed. R. Civ. P. 54(c)………………………………..…………………………..7, 12

Fed. R. Civ. P. 55(a) …………………………………………………..……6, 12

Fed. R. Civ. P. 55(b) …………………………………………..……1, 6, 7, 12

Fed. R. Civ. P. 55(b)(2) …………………………………………………6

Fed. R. Civ. P. 4(d)(3) ………………………….…………………………1

**Local Rules**

Local Rule 55-1 ………...…………………………………………..…1, 6, 7

Local Rule 55-2 …..………………………………………………1, 7

1   **I.    INTRODUCTION**

2        Plaintiff Securities and Exchange Commission ("SEC") respectfully submits

3   this Application for Default Judgment against Defendant Jason "Jai" Johnson

4   ("Defendant" or "Johnson") in accordance with Federal Rule of Civil Procedure

5   55(b) and Local Civil Rules 55-1 and 55-2.

6   **II.    PROCEDURAL HISTORY**

7        During the pre-filing investigation of this matter, Defendant failed to respond

8   to an SEC subpoena for documents and testimony, and, on January 12, 2022, the SEC

9   applied for and obtained an Order Compelling Compliance with Investigative

10  Subpoenas (Declaration of Daniel O. Blau in Support of Plaintiff SEC's Application

11  for Default Judgment Against Defendant Jason "Jai" Johnson ("Blau Decl.") ¶ 2 (Ex.

12  1)). Defendant subsequently gave testimony in the investigation (*id.* ¶ 7).

13       The SEC filed its Complaint on January 19, 2023.[1] The SEC caused Defendant

14  to be served by a waiver of service executed on January 20, 2023 (Dkt. No. 9).

15  Defendant's answer or other response to the Complaint was due under Fed. R. Civ. P.

16  4(d)(3) on March 21, 2023 (*id.*). On March 20, 2023, the parties filed a stipulation,

17  signed by Defendant, which extended the due date for Defendant's answer to April 5,

18  2023 (Dkt. No. 14). On April 5, 2023, the parties filed a second stipulation, signed by

19  Defendant, which extended the due date for Defendant's answer to April 20, 2023

20  (Dkt. No. 29).

21       As of April 28, 2023, Defendant had not filed an answer to the complaint, and

22  on that date the SEC filed a Request by Plaintiff Securities and Exchange

23  Commission for Clerk to Enter Default Against Defendant Jason "Jai" Johnson,

24  which it served on Defendant (Dkt. No. 40). On May 2, 2023, the clerk entered the

25

26  ---

[1] In addition to Defendant, the Complaint charged John Mark Marino, Abraham
27  Borenstein and Anthony Brown with violating federal securities laws. All the other
    defendants filed answers to the Complaint except Marino (Dkt. Nos. 27, 33, 43). The
28  SEC has separately filed an application asking the Court to enter default judgment
    against Marino and consents and proposed judgments as to defendants Anthony
    Brown and Abraham Borenstein.

1  default of Defendant (Dkt. No. 41).

2  **III.   FACTS**

3      **A.    Facts Alleged in the Complaint**

4          **1.    Johnson Background**

5  Jason "Jai" Johnson is a resident of Perris, California. (Compl. ¶ 7).

6          **2.    The Investment Pitch**

7  In or around February 2020, defendant Johnson began pitching an investment

8  opportunity to Victim 1 that Johnson claimed would give Victims 1 and 2 guaranteed

9  substantial returns within 30 days (¶ 13). Johnson described the investment as

10  involving the monetization of an MTN issued by an international bank and said that it

11  would be coordinated by Marino (¶ 14). In touting the opportunity to Victim 1,

12  Johnson represented that he had recently invested in a similar MTN investment with

13  Marino in which each invested $250,000 and received $2.5 million within 30 days (¶

14  15). Johnson also represented that he would be investing their own money alongside

15  Victims 1 and 2 (¶ 16). Johnson told Victim 1 that within 30 to 45 days their returns

16  would be many multiples of what they invested, and he described the investment as

17  risk-free and a "sure thing" (¶ 17). Johnson also guaranteed that he personally would

18  pay back Victims 1 and 2's principal if the underlying MTN transaction did not take

19  place (¶ 18).

20  Johnson introduced Victim 1 to Marino, who further described the investment

21  to Victim 1 (¶ 19). Unbeknownst to Victims 1 and 2, Marino offered commissions to

22  his co-defendants if they could find him an investor (¶¶ 20, 21). Marino, a disbarred

23  attorney with a long criminal record, passed himself off to Victim 1 as a successful

24  practicing attorney who was experienced in similar transactions (¶ 22). In calls with

25  Victim 1 in February and March 2020 in which Johnson participated, Marino told

26  Victim 1 that his money would be used to pay administrative fees in connection with

27  an effort to "monetize" a supposed €1.5 billion MTN issued by a well-known

28  international bank (¶ 23). On these calls, Marino touted the investment's guaranteed

2

exponential returns of roughly $1 million, telling Victim 1 the investment was low risk and a "slam dunk," and that Victims 1 and 2 would be rich after receiving huge returns within 30 days (¶ 24). On these calls, Marino and Johnson stated that they and others had done similar MTN transactions in the recent past and made large profits (¶ 25). Marino guaranteed that the MTN monetization transaction would be complete, and Victims 1 and 2 would have their profits, within 30 days (¶ 27). Marino also stated that if for any reason the monetization transaction did not happen within 30 to 45 days, he would personally pay back Victims 1 and 2's principal investment of $150,000 (¶ 28).

Marino sent Victim 1 an investment agreement attached to an email dated February 24, 2020 (¶ 29). In that investment agreement, Marino again stated that the funds would be used for an MTN transaction and guaranteed repayment of principal if the MTN transaction did not occur within 30 days, extendable upon consent of both parties to 45 days (*id.*). Marino also stated that Victim 1 would be entitled to up to $5 million in profits from the transaction (*id.*). In that February 24, 2020 email, Marino also attached various documents purportedly related to the MTN transaction, including Euroclear and bank statement documentation indicating that an entity named CV International Investments Ltd. owned a €1.5 billion MTN issued by a well-known international bank (¶ 30). Marino provided Victim 1 with wiring instructions for an attorney trust account for the Borenstein McConnell law firm (*id.*).

On March 7, 2020, Johnson forwarded an email to Victim 1 from Marino attaching a substantially identical investment agreement which Marino had drafted (¶ 31). In that investment agreement, Marino reiterated his statements regarding use of funds for an MTN transaction, astronomical returns (up to $1 million), short 30-day duration, and guaranteed repayment of principal (*id.*).

As instructed by Marino, Victims 1 and 2 wired their $150,000 to the attorney trust account for the Borenstein McConnell law firm in March 2020 (¶ 38).

### 3. Johnson False Statements and Misappropriation of Investor Funds

Almost everything that Johnson told Victims 1 and 2 about the supposed investment opportunity was false or misleading (¶ 39).

The MTN-related documentation that Marino sent Victims 1 and 2 via Johnson was an elaborate forgery that falsely indicated that the entity CV International owned a €1.5 billion MTN issued by a well-known international bank (¶ 40). In reality, CV International never owned any such MTN (*id.*). Johnson also falsely represented his backgrounds and experiences with similar transactions (¶ 43). Johnson had never actually made any similar MTN investments, let alone realized the massive profits that he had touted to Victims 1 and 2 (¶ 44). Moreover, Johnson had never invested his own money into this kind of investment (¶ 45). Further, Johnson was not a successful investment adviser and had only "managed" a few thousand dollars for himself and his girlfriend (¶ 46).

Moreover, Marino did not use Victims 1 and 2's funds as he and Johnson had represented he would (¶ 50). Instead, immediately after Victims 1 and 2 wired their funds, Marino directed Borenstein, the Borenstein McConnell law firm principal and supposed transaction "paymaster," to disburse the investor funds from the firm's attorney trust account for purposes unrelated to an MTN monetization (*id.*). At Marino's direction, Borenstein disbursed $5,840 to Johnson as a supposed commission (¶ 59).

No part of Victims 1 and 2's $150,000 was used for the transaction that Marino and Johnson had described to them (¶ 61). Marino has not repaid any of the investors' principal nor any of the promised returns (¶ 62).

### 4. Johnson's Lulling Activity

At various times following the investment, Johnson falsely told Victims 1 and/or 2 that he had not personally received or profited from any of the money Victims 1 and 2 invested (¶ 64). In multiple post-investment oral conversations, and

4

in text messages dated October 7, 2020, October 13, 2020, October 21, 2020, and October 29, 2020, Johnson told Victims 1 and 2 that they would soon be repaid. (¶ 66). As Victims 1 and 2 continued to press for repayment, Johnson made oblique threats to their physical safety, citing Marino's supposed ties to organized crime and Johnson's claimed connections to a Los Angeles-area gang (¶ 69).

### 5.    Johnson's Scienter

Johnson acted with scienter (¶ 71). Johnson knew that he had not made money from investing in similar previous deals, and that he was not going to invest in the instant transaction (¶ 76). Johnson also knew, or was reckless in not knowing, that his statements about guaranteed high returns within a month, and his assurance that he would pay the investors back, were false or misleading (¶ 77). Johnson further acted negligently because his conduct when defrauding Victims 1 and 2 of their $150,000 in retirement savings was unreasonable (¶ 78).

### 6.    The $150,000 Investment is a Security

The $150,000 MTN investment constituted a security (¶ 79). Victims 1 and 2 invested money and expected to receive returns from a successful monetization of an MTN, the managerial efforts for which were to be led entirely by Marino and his associates (¶ 80). Victims 1 and 2's role was to be entirely passive, and they were relying fully on the efforts of Marino and Johnson to generate their promised returns (¶ 81). Victims 1 and 2 understood their funds would be pooled together with those of other investors, including Johnson and Brown, to effectuate the underlying transaction (¶ 82). Victims 1 and 2 understood the fortunes of the investors and the promoters were linked because both were purportedly to achieve returns from the MTN monetization effort (¶ 83).

### B.    Defendant's Ill-Gotten Gains

An account controlled by Johnson in the name of Global Private Investment Partners received $5,840 on March 20, 2020 (Blau Decl. ¶¶ 3 (Ex. 2 at 8), 4 (Ex. 3 at 10).

Marino directed Borenstein to send the $5,840 of the money received from the victims to Johnson (Blau Decl. ¶¶ 5 (Ex. 4 at 146:13 to 147:20), 6 (Ex. 5 at 133:9 to 133:23)). Johnson understood this money to be a commission for his role in the transaction (Blau Decl. ¶ 7 (Ex. 6 at 89:10 to 90:24)).

## IV.  **ARGUMENT**

### A.  **Legal Standard**

Fed. R. Civ. P. 55(b) provides for entry of a default judgment by the Court following entry of a default by the court clerk under Rule 55(a). A failure to make a timely answer to a properly served complaint will justify the entry of a default judgment. *Benny v. Pipes*, 799 F.2d 489, 492 (9th Cir. 1986). Local Rule 55-1 requires that an application for default judgment be accompanied by a declaration setting forth the following information:  (1) when and against which party default was entered; (2) the identification of the pleading to which default was entered; (3) whether the defaulting party is an infant or incompetent person, and if so, whether that person is represented; (4) that the Soldiers' and Sailors' Civil Relief Act of 1940 does not apply; and (5) that notice of the application has been served on the defaulting party, if required by Fed. R. Civ. P. 55(b)(2).

Entry of default judgment is governed by Fed. R. Civ. P. 55(b) and is left to the trial court's sound discretion. *Aldabe v. Aldabe*, 616 F.2d 1089, 1092 (9th Cir. 1980). As the Ninth Circuit held in *Eitel v. McCool*, a district court should consider the following factors: (1) the possibility of prejudice to the plaintiff, (2) the merits of plaintiff's substantive claim, (3) the sufficiency of the complaint, (4) the sum of money at stake in the action, (5) the possibility of a dispute concerning material facts, (6) whether the default was due to excusable neglect, and (7) the strong policy underlying the Federal Rules of Civil Procedure favoring decisions on the merits. 782 F.2d 1470, 1471-72 (9th Cir. 1986). "In applying this discretionary standard, default judgments are more often granted than denied." *PepsiCo, Inc. v. Triunfo-Mex. Inc.*, 189 F.R.D. 431, 432 (C.D. Cal. 1999).

A party seeking a default judgment must state a claim upon which it may recover. *PepsiCo, Inc. v. Cal. Sec. Cans*, 238 F. Supp. 2d 1172, 1175 (C.D. Cal. 2002) ("*PepsiCo*"). After a default has been entered by the court clerk, the well-pleaded factual allegations of the complaint are taken as true, except for those allegations relating to damages. *Id.* (citing *TeleVideo Sys., Inc. v. Heidenthal*, 826 F.2d 915, 917 (9th Cir. 1987)); *see also Benny*, 799 F.2d at 495.

**B.    The SEC has Complied with Rule 55 and Local Rules 55-1 and 55-2**

The SEC has satisfied the procedural requirements for a default judgment pursuant to Fed. R. Civ. P. 55(b) and Local Rule 55-1. Default was entered against Johnson on May 2, 2023 (Dkt. No. 41). The pleading to which the default was entered, and the only pleading in this action, is the Complaint (Dkt. No. 1). Defendant is neither an infant (Blau Decl. ¶ 7 (Ex. 6 at 26:18-20)) nor incompetent (*id.* (Johnson appeared for investigative testimony)). The Servicemembers Civil Relief Act does not apply (*id.* ¶ 8). Notice of this application, and the relief sought, has been served on Defendant (*id.* ¶ 9). Evidence of the amount of Defendant's ill-gotten gains has been provided (*see* Section III.B, *supra*; Blau Decl. ¶¶ 3-4). Additionally, because the SEC does not request relief that differs from or exceeds that prayed for in the complaint, the application for default judgment complies with Fed. R. Civ. P. 54(c).

**C.    The *Eitel* Factors Favor Entry of Default Judgment**

**1.    Possibility of Prejudice to the SEC**

On the first *Eitel* factor, the possibility of prejudice exists when a plaintiff "will likely be without other recourse for recovery" if its motion for default judgment is not granted. *PepsiCo*, 238 F. Supp. 2d at 1177; *see also Landstar Ranger, Inc. v. Parth Enterprises, Inc.*, 725 F. Supp. 2d 916, 920 (C.D. Cal. 2010) (granting default judgment where "[d]enying default judgment here would leave [plaintiff] without a proper remedy").

Here, the SEC seeks to enforce its antifraud claims against Johnson through permanent injunctions, disgorgement, and the imposition of civil monetary penalties.

In the absence of a default judgment, and because Johnson has chosen not to participate in the litigation, "the Commission will be unable to fulfill its mandate to protect the investing public," which demonstrates the possibility of prejudice if default is not granted. *SEC v. Neman*, CV 12-03142-BRO (PLAx), 2016 U.S. Dist. LEXIS 193639, at *11 (C.D. Cal. July 15, 2016) (*citation omitted*); *SEC v. Pedras*, No. CV 13–7932 GAF (MRWx), 2014 WL 12597332, at *4 (C.D. Cal. Apr. 16, 2014) ("If default judgment were not entered, Plaintiff would have no way to enforce the Securities Act or the Exchange Act against Defaulting Defendants.").

### 2.    Substantive Merits and Sufficiency of the Complaint

Together, the second and third *Eitel* factors "require that a plaintiff state a claim on which the [plaintiff] may recover." *PepsiCo*, 238 F. Supp. 2d at 1175 (citations omitted). Well-pleaded allegations are taken as admitted on a default judgment. *Benny*, 799 F.2d at 495. In order to assess whether the SEC has stated a claim, it is necessary to review the allegations of the complaint and determine whether, if proven, they would establish violations of the antifraud provisions.

***Scheme Liability*:** Sections 17(a)(1) and (a)(3) of the Securities Act prohibit any person from, in the offer or sale of a security, directly or indirectly employing "any device, scheme, or artifice to defraud" or engaging in any "transaction, practice, or course of business" which operates or would operate as a fraud or deceit upon the purchaser. 15 U.S.C. § 77q(a)(1) and (a)(3). Similarly, Section 10(b) of the Exchange Act and Rules 10b-5(a) and (c) prohibit any person from directly or indirectly employing "any device, scheme, or artifice to defraud" or engaging in any "act, practice, or course of business" which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of a security. 15 U.S.C. § 78j(b); 17 C.F.R. §§ 240.10b-5(a) and (c). When addressing the scope of Section 17(a)(1), Section 10(b) and Rules 10b-5(a) and (c), the Supreme Court has held that these provisions "capture a wide range of conduct." *Lorenzo v. SEC*, 139 S. Ct. 1094, 1101 (2019); 15 U.S.C. §§ 77q(a)(1) and (a)(3); § 78j(b); 17 C.F.R. §§ 240.10b-5(a)

1    and (c).

2         Here, the Complaint alleges that Johnson engaged in a scheme to defraud by

3    misappropriating investor money for his personal use, disseminating the written

4    investment contract and other information from Marino that contained false and

5    misleading statements, and engaging in other deceptive practices, like falsely

6    claiming that investors were guaranteed substantial returns in a short period of time,

7    he would personally guarantee repayment of the $150,000 principal, he was a

8    successful investment adviser, he personally invested in an MTN transaction with

9    Marino in the recent past, and he made substantial profits from that transaction.

10   Johnson also falsely told the investors he would personally be investing in the instant

11   MTN transaction (Compl. ¶¶ 4-5, 13-26, 31-47, 50, 59-61).

12        ***Materially False and Misleading Statement Liability***: Section 10(b) of the

13   Exchange Act and Rule 10b-5(b) prohibit any person from "making any untrue

14   statement of a material fact" or "omit[ting] to state a material fact necessary in order

15   to make the statements made, in the light of the circumstances under which they were

16   made, not misleading," in connection with the purchase or sale of a security. 15

17   U.S.C. § 78j(b); 17 C.F.R. § 240.10b-5(b). Similarly, Section 17(a)(2) of the

18   Securities Act prohibits obtaining money "by means of" those falsehoods. 15 U.S.C.

19   § 77q(a)(2). A fact is material if there is a substantial likelihood that a reasonable

20   investor would consider it important in making an investment decision. *See TSC*

21   *Indus., Inc. v. Northway, Inc.*, 426 U.S. 43, 449 (1976); *SEC v. Platforms Wireless*,

22   617 F.3d 1072, 1092 (9th Cir. 2010). The Supreme Court has held that, under Rule

23   10b-5(b), the SEC is required to allege and prove who "made" the misrepresentation,

24   but courts have held this requirement does not apply to Section 17(a)(2) claims. *See*

25   *Janus Capital Group, Inc. v. First Derivative Traders*, 564 U.S. 135, 142 (2011);

26   *SEC v. Benger*, 931 F. Supp. 2d 904, 906 (N.D. Ill. 2013) ("vast majority of courts

27   dealing with the question of whether *Janus* also applies to claims under Section 17

28   have answered that question with a resounding 'no'") (citing cases).

As detailed above, the complaint alleges facts showing that Johnson made misrepresentations that were material and were intended to induce investment. The elements of Section 17(a)(2) are further satisfied because the complaint alleges that Johnson obtained $5,840 for himself by making material misrepresentations about the safety and past success of the investment, when he knew that he had no have a track record of successful MTN investments.

***State of Mind and Unreasonable Conduct***: Violations of Section 17(a)(1) of the Securities Act and Section 10(b) of the Exchange Act and Rule 10b-5 thereunder require a showing of scienter, but only negligence is required for Section 17(a)(2) and (a)(3) violations. *Aaron v. SEC*, 446 U.S. 680, 691, 697 (1980).

Scienter is a "mental state embracing intent to deceive, manipulate or defraud." *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193 n.12 (1976). In the Ninth Circuit, scienter may be established by a showing of recklessness. *SEC v. Rubera*, 350 F.3d 1094 (9th Cir. 2001). "Reckless conduct may be defined as a highly unreasonable omission, involving not merely simple, or even inexcusable negligence, but an extreme departure from the standards of ordinary care, and which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it." *SEC v. Platforms Wireless Int'l Corp.*, 617 F.3d 1072, 1096 (9th Cir. 2010) (internal citations omitted). Recklessness may be inferred from circumstantial evidence. *Herman & MacLean v. Huddleston*, 459 U.S. 375, 390-91, n.30 (1983); *SEC v. Burns*, 816 F.2d 471, 474 (9th Cir. 1987).

To establish negligence, the SEC must show that the defendants failed to conform to the standard of care that would be exercised by a reasonable person. *See SEC v. Dain Rauscher*, 254 F.3d 852, 856 (9th Cir. 2001); *SEC v. Hughes Capital Corp.*, 124 F.3d 449, 453-54 (3d Cir.1997) (defining negligence in the securities context as the failure to exercise reasonable care or competence).

There is no dispute that Johnson was acutely aware of his fraudulent scheme and material misrepresentations. Johnson knew that he had not made money from

10

investing in similar previous deals, and that he was not going to invest in the instant transaction. Johnson also knew, or was reckless in not knowing, that his statements about guaranteed high returns within a month, and his assurance that he would pay the investors back, were false or misleading. Finally, Johnson lied to investors after the fact to cover up his fraud and then threatened them when they continued to ask about their investment. Such post-fraud activity is evidence of scienter. *CFTC v. Fin. Tree*, No. 2:20-CV-01184-TLN-AC, 2020 WL 3893390, at *8 (E.D. Cal. July 2, 2020). In addition, Johnson's conduct when engaging in this fraudulent scheme and when making material misrepresentations to investor victims was unreasonable and therefore negligent.

### 3.    Amount at Stake

Turning next to the fourth *Eitel* factor, "the court must consider the amount of money at stake in relation to the seriousness of Defendant's conduct." *PepsiCo*, 238 F. Supp. 2d at 1176. Here, the SEC is asking the Court to exercise its equity power to enjoin defendants and require them to disgorge ill-gotten gains in order prevent unjust enrichment and to exercise its statutory authority to impose civil penalties to deter violations. *SEC v. Rind*, 991 F.2d 1486, 1492-93 (9th Cir. 1993) (disgorgement is a form of injunctive relief, rather than damages); 15 U.S.C. §§ 77t(d)(1), 78u(d)(3)(A) (authorizing civil penalties).

Johnson's fraudulent conduct caused the investor victims to lose $150,000, and Johnson gained $5,840 of that money (*see* Section III.B, *supra*). Given the egregiousness of Johnson's conduct, the amount of ill-gotten gains, and public policies advanced by SEC enforcement actions, a balancing of the equities favors entry of default judgment.

### 4.    Possibility of Disputed Facts

The fifth *Eitel* factor considers the possibility of a dispute as to any material facts in the case. Upon entry of default, all well-pleaded facts in the complaint are taken as true, except those relating to damages. *TeleVideo Sys., Inc.*, 826 F.2d at 917-

18. As set forth above, the allegations in the complaint establish that Johnson violated the federal securities laws. *See, e.g., SEC v. Baccam*, No. ED CV 17-0172 SJO (SPx), 2017 WL 5952168, at *7 (C.D. Cal. June 14, 2017) (granting default judgment where "the SEC filed a well-pleaded Complaint alleging facts sufficient to prevail on its claims" and it and the default motion were "unopposed").

### 5. Possibility of Excusable Neglect

The sixth *Eitel* factor considers the possibility that the default resulted from excusable neglect. Due process requires that all interested parties be given notice reasonably calculated to apprise them of the pendency of the action and be afforded an opportunity to present their objections before a final judgment is rendered. *Mullane v. Central Hanover Trust Co.*, 339 U.S. 306, 314 (1950). The record is clear that Johnson was properly served with the complaint and summons and had an opportunity to respond – he executed the waiver of service (Dkt. No. 9) and two separate stipulations for extensions of his time to answer (Dkt. Nos. 14, 29). In light of the notifications he has received regarding this lawsuit and the elapsed time since this action was filed in January 2023, the possibility that Johnson failed to answer or respond to the Complaint as a result of excusable neglect is remote. Therefore, the sixth *Eitel* factor favors granting default judgment.

### 6. Policy for Deciding on the Merits

Finally, the mere existence of Fed. R. Civ. P. 55(b) indicates that the seventh *Eitel* factor, deciding on the merits, is not alone dispositive. *PepsiCo*, 238 F. Supp. 2d at 1177. As other courts have recognized, "Defendant's failure to answer [the] Complaint makes a decision on the merits impractical, if not impossible." *Id*. Therefore, "[u]nder Fed. R. Civ. P. 55(a), termination of a case before hearing the merits is allowed whenever a defendant fails to defend an action." *Id*. Consequently, the seventh *Eitel* factor does not preclude the Court from entering a default judgment against Johnson.

### D. The SEC Is Entitled to the Relief It Seeks

Fed. R. Civ. P. 54(c) allows only the relief prayed for in the complaint to be

awarded in a default judgment. In this case, the SEC's Complaint sought a judgment: (1) permanently enjoining Johnson from future violations of Section 17(a) of the Securities Act, 15 U.S.C. § 77q(a); Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 thereunder, 17 C.F.R. § 240.10b-5; (2) enjoining Johnson from directly or indirectly, including but not limited to, through any entity owned or controlled by him, from participating in the issuance, purchase, offer, or sale of any security in an unregistered offering, provided, however, that such injunction does not prevent him from purchasing or selling securities for his own personal account; (3) ordering Johnson to disgorge his ill-gotten gains, together with prejudgment interest thereon; and (4) ordering Johnson to pay civil penalties (Compl. at 17-19). The SEC seeks the same relief in this motion.

### 1.    The Court Should Permanently Enjoin Johnson

Section 20(b) of the Securities Act, 15 U.S.C. § 77t(b), and Section 21(d) of the Exchange Act, 15 U.S.C. § 78u(d), provide that upon proper showing, a permanent injunction shall be granted in an enforcement action brought by the SEC. To obtain an injunction, the SEC must establish that: (1) it has actually succeeded on the merits; (2) irreparable harm will likely result in the absence of the injunction; (3) the balance of the equities tips in the Commission's favor, and (4) the injunction is in the public interest. *See Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 32 (2008) (factors pertinent in assessing preliminary or permanent injunctive relief); *see also Starbucks v. McKinney*, 144 S. Ct. 1570, 1576 (2024) (noting that "[w]hen Congress empowers courts to grant equitable relief, there is a strong presumption that courts will exercise that authority in a manner consistent with traditional principles of equity," which, with regard to injunctive relief, includes using "the traditional four-part test" set forth in *Winter*); *SEC v. Chappell*, 107 F.4th 114 (3d Cir. 2024) (applying *Starbucks* to a Commission enforcement action).

As to the first *Winter* factor, Johnson has defaulted—which itself amounts to an admission to the facts in the complaint, *see Benny v. Pipes,* 799 F.2d 489, 495 (9th

1  Cir. 1986), *amended*, 807 F.2d 1514 (9th Cir. 1987) ("Well-pleaded allegations are

2  taken as admitted on a default judgment.")*; see also TeleVideo Sys., Inc.*, 826 F.2d at

3  917-18 (citing *Geddes v. United Financial Group*, 559 F.2d 557, 560 (9th Cir.1977)).

4  As such, the Court should find that the SEC has met this first prong of success on the

5  merits. *See Heat & Frost Insulators of N. California Loc. Union No. 16 Health &*

6  *Welfare Tr. Fund v. Rhodium Integrated Servs.*, No. 21-CV-04084-RS, 2022 WL

7  228304, at *5 (N.D. Cal. Jan. 26, 2022) ("While the first *Winter* factor does not apply

8  neatly in the context of a default judgment, Plaintiffs have laid out concrete

9  arguments for their claims, and [Defendant] is deemed to have admitted the facts

10  regarding culpability.") (citing *TeleVideo Sys., Inc.*, 826 F.2d at 917-18).

11        Second, the likelihood of irreparable harm can be demonstrated by showing the

12  likelihood of Defendants' future violations. *See Chappell*, 107 F.4th at 128-29

13  (recognizing that a "cognizable risk of future harm" satisfies the "irreparable harm

14  requirement") (citing *SEC v. Gentile*, 939 F.3d 549, 555-58 (3d Cir. 2019)). In

15  determining whether there is a reasonable likelihood of future violations, courts

16  consider the following factors:  (1) degree of scienter involved; (2) the isolated or

17  recurrent nature of the infractions; (3) the defendant's recognition of the wrongful

18  nature of his conduct; (4) the likelihood that, based on the defendant's occupation,

19  future violations might occur; and (5) the sincerity of the defendant's assurances

20  against future violations. *SEC v. Murphy*, 626 F.2d 633, 655-56 (9th Cir. 1980); *SEC*

21  *v. Fehn*, 97 F.3d 1276, 1295-96 (9th Cir. 1996). These are commonly referred to as

22  the *Murphy* factors.

23        On the first *Murphy* factor, which looks at the degree of scienter involved,

24  Johnson knew that he had not made money off investing in similar previous deals, and

25  that he was not going to invest in the instant transaction. He also knew, or was reckless

26  in not knowing, that his statements about guaranteed high returns within a month, and

27  his assurance that he would pay the investors back, were false or misleading. Johnson

28  also lulled and threatened investors after the fraud was completed. Accordingly,

Johnson's actions show a high degree of scienter.

On the second, third, and fifth *Murphy* factors, which look at the isolated nature of the conduct and the defendant's likelihood of future violations, Johnson engaged in this fraud for several months and continued to lull the investors for months more. The roughly year-long span of egregious fraud, misappropriation, and attempts to cover up the fraud speaks to "the recurrent nature of the infraction" and "weighs in favor of granting a permanent injunction against" Johnson.  *SEC v. Carter*, No. 8:16-cv-02070-JVS(DFMx), 2023 WL 9197565, at *10 (C.D. Cal. July 14, 2023). Johnson's subsequent failure to participate in the litigations provides no assurances that he will not commit securities violations in the future.  *See, e.g., Baccam*, 2017 WL 5952168, at *9 (holding injunctive relief was appropriate in part because the defendant had "not given any assurances against future violations, but to the contrary, declined to appear in this case").

On the fourth *Murphy* factor, which looks at Johnson's occupation and the likelihood future violations might occur, the evidence shows that Johnson held himself out as an investment professional to the victims. It is thus likely that future securities laws violations will occur.

Turning back to the third *Winter* factor, balancing the equities, the Court should find that this also favors the Commission because "investors need [ ] the protection of an injunction" notwithstanding the private interests of defendants, especially in light of the likelihood of their future fraud violations, as described above.  *SEC v. Manor Nursing Centers, Inc.*, 458 F.2d 1082, 1102 (2d Cir. 1972), *abrogated on other grounds, SEC v. Ahmed*, 72 F.4th 379, 406-07 (2d Cir. 2023).

Finally, as to the fourth *Winter* factor, the fact that Johnson's conduct satisfied all the other factors, including the *Murphy* factors, there is no question that an injunction is in the public interest. "As a practical matter, if a plaintiff demonstrates both actual success on the merits and irreparable injury, it almost always will be the

case that the public interest will favor the plaintiff." *Chappell*, 107 F.4th at 139 (quotation omitted).

### 2. The Court Should Issue a Conduct-Based Injunction Against Johnson

The SEC also seeks a conduct-based injunction enjoining Johnson from participating in the issuance, purchase, offer, or sale of any security in an unregistered offering, other than to purchase or sell securities for his own personal account. For the same reasons described above, the SEC has satisfied the *Winter* and *Murphy* factors needed for the Court to impose a conduct-based injunction. *See SEC v. Moleski*, No. 2:21-cv-01605-SVW-E, 2021 WL 6752254, at * 5 (C.D. Cal. Oct 21, 2021) (quoting 15 U.S.C. § 78u(d)(5)) (Exchange Act Section 21(d)(5) authorizes " 'any equitable relief that may be appropriate or necessary for the benefit of investors,' . . . which can include conduct-based injunctions to prohibit individuals from soliciting others to buy or sell securities"). This conduct-based injunction is needed because it directly targets the misconduct that Johnson engaged in when violating the securities laws in this case.

### 3. The Court Should Order Disgorgement with Prejudgment Interest

"The district court has broad equity powers to order the disgorgement of 'ill gotten gains' obtained through the violation of the securities laws." *SEC v. First Pac. Bancorp*, 142 F.3d 1186, 1191 (9th Cir. 1998) (citations omitted). "Disgorgement is designed to deprive a wrongdoer of unjust enrichment, and to deter others from violating securities laws by making violations unprofitable." *Platforms Wireless*, 617 F.3d at 1096 (citation omitted). Under the Supreme Court's decision in *Liu*, a district court may only order disgorgement in an amount that "does not exceed a wrongdoer's net profits and is awarded for victims." *Liu v. SEC*, 591 U.S. 71, 74 (2020). *Liu* did not disturb, however, the principle that "[d]isgorgement need be 'only a reasonable approximation of profits causally connected to the violation.'" *Platforms Wireless*,

617 F.3d at 1096 (quoting *First Pac. Bancorp*, 142 F.3d at 1191); *SEC v. Yang*, 824 Fed. Appx. 445 (9th Cir. 2020) (applying this standard after *Liu*). Once the SEC presents a reasonable approximation, the burden shifts and the defendant must "demonstrate that the disgorgement figure was not a reasonable approximation." *Platforms Wireless*, 617 F.3d at 1096 (quoting *SEC v. First City Financial Corp.*, Ltd., 890 F.2d 1215, 1232 (D.C. Cir. 1989)); *see also SEC v. Premier Holdings*, No. 21-55249 2022 WL 541194, at *1 (9th Cir. 2022) (citing *Platforms Wireless* at 1096). The Ninth Circuit has found that shifting the burden to defendants is appropriate because "defendant are more likely than the SEC to have access to evidence" demonstrating that the SEC's approximation is not reasonable. *Id*. (quoting *First City Financial Corp.*, 890 F.2d at 1231-32). The Ninth Circuit further concluded that "the risk of uncertainty should fall on the wrongdoer whose illegal conduct created that uncertainty." *Id*.; *see also SEC v. Giguiere*, No. 18-cv-1530-WQH-JLB, 2024 WL 3550395, at *5 (S.D. Cal. Jun. 1, 2024).

The Court should also award prejudgment interest on any award of disgorgement so as to ensure that parties do not profit from their illicit gains and unjust enrichment. *See Manor Nursing*, 458 F.2d at 1105; *SEC v. Cross Fin. Services, Inc.*, 908 F. Supp. 718, 734 (C.D. Cal. 1995). Whether to grant prejudgment interest and the rate to be used are generally matters in the district court's broad consideration, taking into the account the need to fully compensate the wronged party for actual damages suffered, consideration of fairness and the relative equities of the award, the remedial purpose of the statute involved, and such other general principles considered relevant by the court. *See SEC v. Olins*, 762 F. Supp. 2d 1193, 1198-99 (N.D. Cal. 2011), as amended (Feb. 25, 2011) (citing *SEC v. First Jersey Sec., Inc.*, 101 F.3d 1450, 1476 (2d Cir. 1996)).

The SEC has exceeded its burden of establishing a reasonable approximation of Johnson's illicit gains. *See* Section III.B, *supra*. Specifically, the SEC has shown Johnson received $5,840 sourced from the victim's funds (Blau Decl. ¶¶ 3 (Ex. 2 at

8), 4 (Ex. 3 at 10)). The amount of prejudgment interest that should be added to disgorgement should be $1,901.90 (Blau Decl. ¶ 10 (Ex. 7)). The prejudgment interest should run from March 2020, when the victims' funds were misappropriated, and be based on the rate of interest used by the Internal Revenue Service for the underpayment of federal income tax as set forth in 26 U.S.C. § 6621(a)(2). The Ninth Circuit has affirmed this method of calculation. *See Platforms Wireless*, 617 F.3d at 1099.

### 4.    Johnson Should Pay a Substantial Civil Penalty

Johnson's violation of the Securities Act and the Exchange Act warrants a significant civil penalty under Section 20(d) and Section 21(d)(3) of those Acts, respectively. *See* 15 U.S.C. §§ 77t(d)(1), 78u(d)(3)(A). Under Section 20(d)(2)(A) of the Securities Act and Section 21(d)(3)(B) of the Exchange Act, the amount of any civil penalty "shall be determined by the court in light of the facts and circumstances." *Id.* §§ 77t(d)(2)(A), 78u(d)(3)(B). The Securities Act and the Exchange Act provide that penalties should be assessed according to a three-tier system. *See* 15 U.S.C. §§ 77t(d)(2), 78u(d)(3)(B). Third-tier penalties apply to violations that (i) involve "fraud, deceit, manipulation, or reckless disregard of a regulatory requirement" and (ii) "directly or indirectly resulted in substantial losses or created a significant risk of substantial losses to other persons." *Id*. §§ 77t(d)(2)(C), 78u(d)(3)(B)(iii). A penalty cannot exceed the greater of either a specific statutory amount, or "the gross amount of pecuniary gain to such defendant as the result of the violation." *Id*. §§ 77t(d)(2), 78u(d)(3)(B). Because civil penalties are imposed to deter the wrongdoer from similar conduct in the future, in assessing civil penalties, courts frequently apply the aforementioned *Murphy* factors, 626 F.2d 633, used to establish the need for injunctive relief. *See*, *e.g*., *SEC v. Abacus Int'l Holding Corp*., 2001 U.S. Dist. LEXIS 12635, at *15 (N.D. Cal. Aug. 16, 2001).

For Johnson, the SEC recommends a third-tier civil monetary penalty of $20,000. Johnson's conduct satisfies all the *Murphy* factors (*see* Section IV.D.1,

*supra*). Specifically, his conduct involved a high degree of scienter, was not an isolated occurrence, and there is a strong likelihood he will engage in similar conduct in the future. This penalty is sufficient to deter Johnson from similar fraudulent conduct in the future and proportionate to the gain he received from the fraudulent conduct.

## V.    CONCLUSION

For the reasons set forth above and in the accompanying Blau Declaration, the SEC respectfully requests that the Court enter default judgment against Johnson consistent with this application.

DATED: July 21, 2025

Respectfully submitted,

*/s/ Daniel O. Blau*

Daniel O. Blau
Christopher A. Nowlin
Attorneys for Plaintiff
Securities and Exchange Commission